**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____
                                                    :
ELAINE SAUCEDO,                    :
                                                    :
                    Plaintiff,              :
                                                    :                    Civil No. 10-253 (RBK)
          v.                                    :
                                                    :                         **OPINION**
MICHAEL J. ASTRUE, Commissioner   :
of Social Security,                       :
                                                    :
                    Defendant.           :
_____  :


**KUGLER**, United States District Judge:

        This matter comes before the Court on an appeal filed by Plaintiff Elaine Saucedo from a

decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff

supplemental security income ("SSI") pursuant to Section 205(g) of the Social Security Act, 42

U.S.C. § 405(g).  After Plaintiff filed the appeal, both parties moved for summary judgment.  For

the reasons expressed below, the Court will grant the Commissioner's motion for summary

judgment, and deny Plaintiff's motion for summary judgment.

**I.        BACKGROUND**

   **A.  Procedural History**

        On May 31, 2007, Plaintiff filed an application for SSI, alleging that she became disabled

on October 1, 2007, due to bipolar and personality disorders.  (Tr. 31, 89).  Plaintiff's claim was

denied on August 23, 2007, and again upon reconsideration on February 27, 2008.  (Tr. 31, 40).

Thereafter, Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 46).

Plaintiff appeared before ALJ Melvin Benitz on August 6, 2009, represented by counsel.  (Tr.

329).  On September 21, 2009, the ALJ found that Plaintiff was not disabled within the meaning

of the Social Security Act on May 31, 2007, the date she filed the application for SSI.  (Tr. 16).

The Appeals Council denied Plaintiff's request for review of the ALJ's decision.  (Tr. 5).  On

March 31, 2010, Plaintiff filed the complaint in this action seeking review of the ALJ's decision.

(Doc. No. 2).  Both parties moved for summary judgment.  (Doc. Nos. 18, 22).

**B.  Plaintiff's Medical History**

Plaintiff was twenty-five years old at the time the ALJ issued the decision denying her

application for SSI.  (Tr. 368).  Plaintiff completed two years of high school, but dropped out of

school after the tenth grade.  (Id.).  At the time Plaintiff filed her application for disability

benefits, she had three children and a husband who provided her with some financial support.

(Id.).  Plaintiff reported that her husband often works out of state, so she is the primary caretaker

for her children.  (Tr. 336-38).  Plaintiff also reported that the only income she receives is from

her husband.  (Tr. 368).  Plaintiff testified that she no longer receives welfare benefits because

she has more than one child.  (Tr. 368).

Plaintiff claims that she suffers from a variety of symptoms associated with her mental

disability.  During the ALJ hearing, Plaintiff testified that she easily loses control when she gets

frustrated.  (Tr. 350).  She also testified that she experiences mood swings which cause her to get

angry frequently.  (Id.).  In particular, Plaintiff complained that changes to her routine cause her

to get angry.  (Tr. 351).  For example, Plaintiff testified that she becomes frustrated when

anything disrupts her ordinary routine in the morning such as an unexpected telephone call.

(Id.).  Plaintiff also claimed that she has difficulty concentrating on ordinary, mundane tasks

such as vacuuming the house and washing dishes.  (Tr. 351).  In addition, Plaintiff testified that

she cannot sit still long enough to read or watch television without moving around and performing another task.

Plaintiff rapidly transitions from "feeling good" to experiencing depression. (Tr. 355). At times, she gets "very excited" and begins talking "too fast." (Tr. 358). After taking her medication, Plaintiff sleeps twelve to thirteen hours, but wakes frequently. (Tr. 359). Any small noise disrupts her sleep such as "a bang on the wall, or even cars [passing] by." (Tr. 360). When she hears noises, she wakes, secures her son's baseball bat and walks around the house searching for intruders. (Tr. 360). She cannot return to sleep until she determines the source of the unfamiliar noise. (Tr. 361). When Plaintiff wakes in the morning, she cannot sit still, and immediately begins to care for her children and perform other household tasks such as cleaning, washing clothes, mopping, vacuuming, picking items up around her house, talking on the phone, fixing her bed or washing bathrooms. (Id.).

During her hearing before the ALJ, Plaintiff stood approximately 5'2" tall and weighed 145 pounds. (Tr. 369). She testified that she could lift twenty to twenty-five pounds and had no difficulty standing or walking. (Tr. 369-70). However, when the ALJ asked whether she had trouble sitting, Plaintiff responded affirmatively. (Tr. 370). Plaintiff also testified that she can sit still for only ten to fifteen minutes before her hands or legs begin to twitch. (Id.). In order to control the twitch, Plaintiff stands up and walks. (Id.). Plaintiff also begins to twitch if she stands still for an extended period of time. (Tr. 372).

During the hearing before the ALJ, the ALJ took testimony from Mr. Tony Melanson, a vocational expert ("VE"). (Tr. 373). The ALJ provided the VE with the following description of Plaintiff and asked the VE to describe the work that an individual with Plaintiff's limitations can perform. The ALJ described Plaintiff as an individual:

> [s]uffering from the depression . . . with a bipolar component.
> [Plaintiff also] has a personality disorder . . . which cause[s] her to
> have moderate depression with infrequent mood swings somewhat
> relieved by her medications, without significant side effects. But
> [Plaintiff] indicates she gets constipation from one or a
> combination. . . . [Plaintiff] seems to be moderately limited [in] her
> ability to perform her ADLs, and to interact socially and to
> maintain her concentration, persistence and pace. . . . [Plaintiff
> can] . . . lift ten pounds frequently, 20 on occasion, stand for four
> hours, sit for four hours consistently on a eight hours and five days
> a week, [and should] avoid heights and hazardous activities.

(Tr. 373-74) (errors in original). In addition, the ALJ noted that Plaintiff "needs to have a simple routine, unskilled job . . . [requiring] low stress, low concentration, [and] low memory due . . . [to] her depression and bipolar [disorder]," and that Plaintiff should perform jobs that require "little interaction with . . . co-workers or supervisors." (Id.). The VE responded that an individual with those limitations could perform the work of a light inspector, laundry worker, and sedentary inspector. The VE explained that there are approximately 170 positions for light inspectors within seventy-five miles of Dover, Delaware, and 90,000 positions in the national economy. (Tr. 374). The VE stated that there were approximately 200 positions for laundry workers within seventy-five miles of Dover, Delaware, and approximately 110,000 in the national economy. (Tr. 375). Finally, the VE testified that there are approximately 170 sedentary inspector positions in the local region and 85,000 positions in the national economy.

Plaintiff testified that she takes Seroquel, Vistaril, and Xanax, but complains that those drugs cause her to experience constipation. (Tr. 383). Plaintiff claims that a doctor informed her that stress and anxiety also contribute to her constipation. (Tr. 364-65).

Between 2002 and 2007, Plaintiff held a variety of jobs for relatively short periods of time. In 2002, she worked at a local café for approximately two weeks. (Tr. 332-33). Although she has difficulty recalling the precise reason for her departure, she believes that she left her

employer "because [of] disruptions . . . with [fellow] employees."  (Tr. 333).  Later that year, Plaintiff worked for Wal-Mart for approximately one month.  (Tr. 333).  Plaintiff claims that she left her position with Wal-Mart because she experienced "hemorrhaging" and needed to take medical leave.  (Id.).  In 2003, Plaintiff worked for Maryland Coast Pizza Hut, but left her job after a few weeks because she had difficulty getting transportation to work.  (Tr. 333-34).  In 2005, Plaintiff worked for Movie Gallery Services in Milford for approximately one month.  (Tr. 334).  Plaintiff claims that Movie Gallery Services terminated her employment because she was spending time with her son in the hospital.  (Id.).  Plaintiff also worked for Dollar Tree in 2006 for one month.  (Id.).  Plaintiff claims that she left that job because she had difficulty finding someone to care for her children.  (Id.).  In 2007, Plaintiff worked at a Home Improvement store in Seaford, New Jersey for two to three weeks.  (Id.).  Finally, Plaintiff worked for Turnston Builders in 2007.  (Tr. 334-35).  Plaintiff abruptly quit her job with Turnston Builders.  Plaintiff provided the following testimony concerning her decision to leave Turnston Builders:

> The type of work they were making me do was like I got it in the beginning.  And then I started making a lot of mistakes.  And then I didn't understand them.  And then [they] would explain it to me again.  And I wasn't, I wasn't set for the works.  I didn't understand what, I didn't understand the title, because in the beginning I did.  But then it kind of get [sic] confusing and they let me go, too.

(Tr. 335) (errors in original).

Plaintiff also testified that she had difficulty working with fellow employees and her supervisors.  When asked how she got along with her co-workers and managers, Plaintiff responded, "I had to put up with a lot of anger.  I always, I was always angry about something.  My frustration level would go from one moment all the way up here in a matter of seconds."  (Tr. 335).

### C. Medical Examinations

Plaintiff underwent several medical examinations between 2001 and 2009.

Dr. Harris Finkelstein, a psychologist, examined Plaintiff on October 4 and 25, and on November

6 and 15, 2001.  (Tr. 191).  After examining Plaintiff's psychological condition, Dr. Finkelstein

reported that Plaintiff:

> [L]acks the internal resources necessary to address challenging or
> stressful situations.  She is chronically vulnerable to becoming
> disorganized by many of the natural everyday stresses of living in
> a complex society.  She functions most effectively in environments
> that are well-structured and reasonably free of ambiguity . . . . She
> has a lack of consistency in her thinking, especially during
> problem solving.  This puts her at greater risk for errors in
> judgment.

(Tr. 194-95).  Dr. Finkelstein diagnosed Plaintiff with "borderline personality disorder."  (Tr.

196).

Margaret Bhatt, a child psychologist, evaluated Plaintiff on February 26, 2002.  Dr. Bhatt

reported that Plaintiff complained of "paranoid thoughts with intense emotional outbursts," and

stated that she experiences mood swings and threatened to kill her mother.  (Tr. 320).  However,

after examining Plaintiff, Dr. Bhatt reported that Plaintiff was cooperative during the

examination and appeared alert.  (Tr. 321).  Dr. Bhatt also reported that Plaintiff's "speech was

coherent and somewhat evasive."  (Id.).  Dr. Bhatt noted that Plaintiff "denied preoccupation's

[sic] or death wishes" and "dissociative phenomenon, delusions or hallucinations."  (Id.).

Between February 2004 and February 2005, Plaintiff underwent numerous medical

examinations at Bridge Counseling Center ("Bridge").  (Tr. 201-206).  The results of those

examinations reveal that Plaintiff's mood and temperament fluctuated dramatically.[1]  For

example, during an evaluation on February 4, 2004, an examiner noted that Plaintiff's mood was

---

[1] It is unclear whether a physician examined Plaintiff on each occasion.

"depressed," "fearful," and "sad." (Tr. 215). However, the examiner also reported that Plaintiff appeared "relaxed" during the interview, and was capable of making eye-contact with the interviewer. (Id.). The examiner noted that Plaintiff's speech was "rapid" and "coherent." (Id.). Based upon those observations, the examiner diagnosed Plaintiff with bipolar disorder and borderline intellectual functioning. (Tr. 215).

The record also contains progress notes from Bridge between 2004 and 2005. A progress report from January 2004 states that Plaintiff's "bi-polar condition seem[ed] stabilized," (Tr. 207), and a report from February 2004 states that Plaintiff recently returned from a two-week cruise with her mother. (Tr. 210). In October 2004, an examiner noted that Plaintiff was "doing remarkably well considering how little support she gets." (Tr. 204). At the time, Plaintiff also reported no depression "that is disruptive to daily functioning." (Id.). On December 15, 2004, an examiner noted that Plaintiff was "calmer" and reported working twenty hours per week at a video store. (Tr. 201).

Between July 2007 and December 2007, Plaintiff was examined and treated by Cindy Cunningham, an advanced practical registered nurse, and Nancy Boone, a licensed counselor, at the Behavioral Health Center ("BHC"). On July 25, 2007, Boone examined Plaintiff at BHC. Boone noted that Plaintiff complained of depression. (Tr. 255). Boone reported that Plaintiff's mood was anxious and that her impulse control and insight were impaired. (Tr. 258). Based on her evaluation, Boone diagnosed Plaintiff with depression, and gave her a Global Assessment of Functioning ("GAF") score of 65. (Tr. 259). The GAF scale is a metric used by the American Psychiatric Association to assess an individual's psychological, social, and occupational functioning. See Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000). A GAF score of 61 to 70 generally indicates that an individual has "mild symptoms" or "some

difficulty in social, occupational, or school functioning." Id. Critically, however, a person with a GAF score of 61 to 70 "generally function[s] pretty well, [and] has some meaningful interpersonal relationships." Id.

During an examination on October 8, 2007, Plaintiff reported that she was extremely anxious, and claimed that she experienced hallucinations. (Tr. 247). In particular, Plaintiff complained that she experienced hallucinations of a person with a knife at night. (Id.). Based upon her observations, Cunningham diagnosed Plaintiff with bi-polar disorder, and gave her a GAF score of 65-70. (Tr. 251).

On February 25, 2008, Dr. Christopher King, a state agency psychologist, performed a mental residual functional ("RFC") assessment, based on Plaintiff's medical records. (Tr. 260-62). With respect to memory functions, Dr. King determined that Plaintiff had no significant limitations on her ability to understand and remember short and simple instructions, and remember "work-like procedures." (Tr. 260). In the area of concentration and persistence, Dr. King found that Plaintiff had no significant limitations on her ability to: (1) carry out very short and simple instructions; (2) perform activities within a schedule, maintain regular attendance, and be punctual with customary tolerances; (3) sustain an ordinary routine without special supervision; (4) work in coordination with or proximity to others without being distracted by them; and (5) make simple work-related decisions. (Tr. 260-61). Dr. King also found that Plaintiff had no significant limitation on her ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and . . . perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 261).

In the area of social interaction, Dr. King found that Plaintiff had no significant limitations in her ability to: (1) accept instructions and respond appropriately to criticism from

supervisors; (2) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (3) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Id.). Finally, in the area of adaptation, Dr. King assessed that Plaintiff had no significant limitations on her ability to: (1) travel in unfamiliar places or use public transportation; and (2) set realistic goals or make plans independently of others. (Id.).

In addition to those findings, Dr. King conducted a functional capacity assessment. In that assessment, Dr. King noted that Plaintiff had a "history of mental health problems," and diagnosed her with depressive and bipolar disorders. (Tr. 262). Dr. King also noted that Plaintiff demonstrated a "a favorable response to treatment, with attenuated symptoms and general improvement in her overall condition." (Id.). Based on his overall assessment of Plaintiff's records, Dr. King concluded,

> [Plaintiff] is able to manage basic ADLs independently, but does appear to have a history of problematic social functioning and is seemingly better suited to jobs that do not require much interaction with others. There is no indication of any marked deficits in cognitive functioning. No MSO in file, but she appears capable of simple tasks, and should be able to sustain a basic work routine.

(Tr. 262).

On February 25, 2008, Dr. King also completed a Psychiatric Review Technique form. (Tr. 263-73). Dr. King determined that Plaintiff suffered from an affective disorder. (Tr. 263). In that form, Dr. King noted that Plaintiff's affective disorder did support a listing level impairment because it caused: (1) a mild restriction in daily living; (2) moderate difficulty in maintaining social functioning; (3) moderate difficulty in maintaining concentration, pace, and persistence; and (4) one or two repeated episodes of decompensation, each of extended duration.

The record contains progress notes from Plaintiff's visitations to Phoenix Behavioral Health between January 2008 and August 2008. (Tr. 274-84). In January 2008, an examiner

noted that Plaintiff was in a "tired, calm mood." (Tr. 284). The following month, Cunningham observed that Plaintiff was depressed and anxious, and diagnosed Plaintiff with a major depressive disorder. (Tr. 283). On March 11, 2008, Boone observed that Plaintiff was easily agitated, and demonstrated an irritable mood. (Tr. 282). On April 9, 2008, Boone observed that Plaintiff was easily frustrated, loud, and hyper. (Tr. 279). On July 16, 2008, Boone reported that Plaintiff exhibited a "normal tone" and noted that Plaintiff's mood swings decreased. (Tr. 275). Boone also noted that her Plaintiff's marriage was better. (Id.). Thereafter, on July 29, 2008, Boone reported that Plaintiff was "tired," and noted that her marriage was better overall. (Id.).

The record also contains progress notes from Plaintiff's examinations at F.H. Everett & Associates between August 2008 and July 2009. (Tr. 285-300). On August 27, 2008, Cunningham examined Plaintiff and noted that she was neat and cooperative, maintained normal eye contact, and was friendly and spontaneous. (Tr. 297). In addition, Cunningham noted that Plaintiff was alert and oriented, that her attention was intact and her concentration was adequate. (Tr. 289). Cunningham also reported that Plaintiff's impulse control, common sense, and intellectual insight were fair. (Id.). However, Cunningham noted that Plaintiff's emotional insight was poor. (Id.). Cunningham diagnosed Plaintiff with bipolar disorder and a GAF score of 60.[2] (Tr. 299).

Thereafter, on July 20, 2009, Cunningham completed a Psychological Functional Capacities Evaluation form. (Tr. 301). In the section of the form entitled "Estimated Degree of Impairment," Cunningham noted that Plaintiff demonstrated a "moderate" restriction to her ability to engage in daily activities, "mild" deterioration of personal habits, and "moderate" constriction of interests. (Tr. 301). In a separate section of the form entitled "Estimated Degree

---

[2] A GAF score of 60 indicates that an individual suffers "moderate symptoms," or "moderate difficulty in social, occupational, or school functioning." See Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).

of Impairment to the Ability to Perform the Following as a Full Time Employee," Cunningham noted that: (1) Plaintiff's ability to understand simple, primarily oral instructions and carry out instructions under ordinary supervision were moderately impaired; and (2) Plaintiff's ability to cope with the pressures of ordinary work and perform routine, repetitive tasks under ordinary supervision was moderately impaired. (Tr. 301-302). However, Cunningham reported that Plaintiff's ability to sustain work performance and attendance in a normal work environment were severely impaired. (Id.).

## II.    STANDARD

### A.  Review of the Commissioner's Final Decision

District court review of the Commissioner's final decision is limited to ascertaining whether the decision is supported by substantial evidence. Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Morales v. Apfel, 225 F.3d 310, 316 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)). If the Commissioner's determination is supported by substantial evidence, the Court may not set aside the decision, even if the Court "would have decided the factual inquiry differently." Fargnoli v. Masanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Hartranft, 181 F.3d at 360). A district court may not weigh the evidence "or substitute its conclusions for those of the fact-finder." Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).

Nevertheless, the reviewing court must be wary of treating "the existence vel non of substantial evidence as merely a quantitative exercise" or as "a talismanic or self-executing formula for adjudication." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983) ("The search for

substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.").  The Court must set aside the Commissioner's decision if the Commissioner did not take into account the entire record or failed to resolve an evidentiary conflict.  Schonewolf v. Callahan, 972 F. Supp. 277, 284-85 (D.N.J. 1997) ("Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.") (quoting Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978)).  Furthermore, evidence is not substantial if it constitutes "not evidence but mere conclusion," or if the ALJ "ignores, or fails to resolve, a conflict created by countervailing evidence."  Wallace v. Sec'y of Health & Human Servs., 722 F.2d 1150, 1153 (3d Cir. 1983) (citing Kent, 710 F.2d at 114).

### B.  Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could find for the non-moving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When a court weighs the evidence presented by the parties, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [his] favor."  Id. at 255.  The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  In re Bressman, 327 F.3d 229, 237 (3d Cir. 2003) (quoting Celotex, 477 U.S. at 331) (Brennan, J., dissenting).  The moving party may satisfy this burden by either (1) submitting affirmative

evidence that negates an essential element of the nonmoving party's claim; or (2) demonstrating to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's case. Id. at 331.

Once the moving party satisfies this initial burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). To do so, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to material facts." Matsushida Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, to survive a motion for summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322. Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, No. 06-2328, 2007 WL 2709661, at *1 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2003)).

In deciding the merits of a party's motion for summary judgment, the court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. Credibility determinations are the province of the factfinder, not the district court. BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.   DISCUSSION

### A.  Whether the ALJ Gave Undue Weight to the Opinion of Dr. King

Plaintiff argues that the ALJ erred by giving undue weight to the opinion of Dr. King. First, Plaintiff contends that the record does not support Dr. King's conclusion that Plaintiff did

not receive a diagnosis of anxiety disorder, and that Plaintiff demonstrated a "favorable response to treatment, with attenuated symptoms and general improvement in her overall condition." (Tr. 262). Second, Plaintiff asserts that Dr. King's opinion is entitled to less weight because he never met Plaintiff, but instead based his opinion upon a review of the administrative record. Finally, Plaintiff contends that Dr. King did not consider the forty-four pages of mental health treatment notes included in the record after July 25, 2007 – the date when Dr. King completed his report. (Pl.'s Br. at 14). The Commissioner argues: (1) Dr. King's opinion is supported by the treatment records from Phoenix Behavioral System and Cunningham's medical reports, (Def.'s Br. at 16) (citing Tr. 26); (2) the ALJ did not err by relying heavily on Dr. King's assessment of Plaintiff's condition because "an ALJ may rely on the opinions of non-examining physicians, even when those opinions contradict the opinion of a treating physician," (Def.s' Br. at 16); and (3) even if Dr. King did not have access to the mental health treatment notes included in the record after July 2007, the ALJ had access to them and considered them in his report.

The Court finds that the ALJ did not err by relying heavily upon Dr. King's assessment of Plaintiff's alleged disability. First, the ALJ may consider Dr. King's opinion even though he is not a treating physician. Dr. King is an agency psychological consultant. Social Security Ruling 96-6p states that "[s]tate agency medical and psychological consultants are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." 20 C.F.R. 416.927(f). An ALJ may give weight to the opinions of non-examining physicians when the administrative record supports those opinions. See Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1991) (noting that an ALJ may consider opinions of non-examining state agency physicians when those opinions contradict the opinions of treating physicians). Thus, because Dr. King is an agency psychological consultant,

the ALJ may consider his opinion to the extent that it is consistent with the other evidence in the administrative record.

Second, the Court finds that Dr. King did not commit reversible error by determining that the record lacked evidence that none of Plaintiff's medical examiners specifically diagnosed her with an anxiety disorder, and finding that Plaintiff's "progress notes . . . reflect a favorable response to treatment." (Tr. 262). With respect to Dr. King's statement that no medical examiner diagnosed Plaintiff with anxiety disorder, Plaintiff does not point to any evidence in the record that she was specifically diagnosed with anxiety disorder. Thus, the ALJ did not err by relying on Dr. King's determination that Plaintiff's testimony that she suffered from anxiety disorder is only partially credible.

As to Dr. King's statement that Plaintiff's "subsequent progress notes [after the July 25, 2007 initial evaluation] reflect a favorable response to treatment, with attenuated symptoms and general improvement in her overall condition," the administrative record is less clear. (Tr. 262). Some of Plaintiff's progress reports indicated that her symptoms improved, whereas other progress reports suggest that her condition remained the same or worsened.[3] Thus, it is unclear whether the administrative record as a whole supports this portion of Dr. King's report.

---

[3] On July 25, 2007, a counselor examined Plaintiff's condition. At the time, Plaintiff reported a high level of stress, and stated that she was separated from her husband. (Tr. 255). Plaintiff also complained of depression that was "real bad," a decreased appetite, and pervasive fatigue. (Id.). The medical examiner noted that Plaintiff experienced marital stress, and noted that Plaintiff was "yelling" and exhibited "severe anger." (Id.). Finally, the medical examiner noted that Plaintiff slit her wrist sometime in December 2004. (Id.).

However, after the progress report on July 25, 2007, there is conflicting evidence of Plaintiff's level of improvement. For example, Plaintiff's August 15, 2008 progress report states that her condition "somewhat improved." (Tr. 253). However, her progress report from August 30, 2007 stated that she was "loud" and "agitated," and indicated that she experienced "marital conflict." (Id.). On September 18, 2007, Plaintiff's progress report notes that she was "emotional" and experienced "marital/parenting stress." (Tr. 252). On October 8, 2007, Cunningham gave Plaintiff a GAF score of 65-70, indicating that Plaintiff's symptoms were "mild." (Tr. 247). However, on October 29, 2007, Plaintiff's progress report noted that she was in an "irritable mood," that she cried frequently, and experienced "marital conflict." Yet on November 6, 2007, Plaintiff's progress report indicated that she had a "smooth" week, that some of her days were "relaxed," and she was "doing ok." (Tr. 245). In sum, the administrative record does not conclusively establish that Plaintiff's condition substantially improved between July 25, 2007, and February 25, 2008 – the date Dr. King completed his report.

In any event, the administrative record as a whole supports Dr. King's ultimate conclusion that Plaintiff had mild restrictions in daily living and social functioning, and could perform simple tasks in jobs that require little interaction with others. As previously mentioned, Plaintiff consistently received GAF scores between 61 and 70 from Cunningham and Boone. Those scores support Dr. King's determination that Plaintiff had moderate limitations in daily living, social functioning and concentration. In addition, Plaintiff testified that she cares for three children and performs a variety of tasks in her household such as vacuuming, mopping, washing the bathrooms and cooking. That testimony supports Dr. King's determination that Plaintiff could perform simple tasks and jobs that do not require much interaction with others. Furthermore, the reports from Phoenix Behavioral Health support Dr. King's findings. At least two progress reports from Phoenix Behavioral Health reveal that Plaintiff demonstrated mild symptoms when her marriage improved. (Tr. 275). Therefore, because the administrative record supports Dr. King's conclusion that Plaintiff's symptoms were moderate and she could perform jobs that require little interaction with others, the Court cannot say that the ALJ committed reversible error by according weight to Dr. King's report.

Plaintiff's contention that Dr. King failed to consider forty-four pages of mental health treatment notes after July 2007 is unavailing. Although it may be true that Dr. King did not consider those notes, the Court must determine whether the <u>ALJ</u> considered all of the relevant evidence in the administrative record. <u>See</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 705-707 (3d Cir. 1981) ("In determining whether substantial evidence supports the ALJ's decision, the district court must assess whether the <u>ALJ</u> considered all relevant evidence and explained why it rejected any relevant evidence.") (emphasis added). The ALJ's opinion clearly demonstrates that he considered mental health treatment notes after July 2007. (<u>See</u> Tr. 25) (evaluating the

Psychological Functional Capacities Evaluation Form Cunningham completed in July 2009).

Moreover, Plaintiff's argument that Dr. King did not consider all of the evidence in the administrative record is unavailing because the district court must determine whether the <u>ALJ</u> considered all relevant evidence in the administrative record, not whether each medical expert considered all relevant evidence in the administrative record. <u>See</u> <u>Cotter v. Harris</u>, 642 F.2d 700, 705-707 (3d Cir. 1981) ("In determining whether substantial evidence supports the ALJ's decision, the district court must assess whether the ALJ considered all relevant evidence and explained why it rejected any relevant evidence."). Here, the ALJ's opinion demonstrates that the ALJ considered mental health treatment notes after July 2007. (<u>See</u> Tr. 25) (evaluating the Psychological Functional Capacities Evaluation Form Cunningham completed in July 2009). Thus, Plaintiff's argument that Dr. King did not examine the entire administrative record is unpersuasive.

Therefore, because the administrative record supports many of Dr. King's findings regarding Plaintiff's alleged disability, the ALJ did not err in relying on Dr. King's report.

### B. Whether the ALJ Gave Sufficient Weight to the Opinion of Nurse Cunningham

Plaintiff argues that the ALJ failed to give appropriate weight to the opinion of Cunningham. Specifically, Plaintiff asserts that because Cunningham treated Plaintiff for almost three years, the ALJ should give her opinion the same weight as an "acceptable medical source" under Social Security Ruling 06-3p. The Commissioner argues that Cunningham is a practical registered nurse, not a licensed medical doctor, and therefore she does not qualify as an "acceptable medical source" under 20 C.F.R. § 416.913(a). The Commissioner also argues that Cunningham's opinions are not entitled to significant weight because they are internally

inconsistent, and unsupported by the record as a whole.  The Court agrees with the Commissioner.

An SSI claimant must provide evidence of a medically determinable impairment from an "acceptable medical source[]."  20 C.F.R. § 416.913(a).  Section 416.913(a) identifies the following acceptable medical sources:  licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists.  20 C.F.R. § 416.913(a)(1)-(5).  An ALJ may also consider the report of a non-medical source in determining whether the plaintiff is disabled within the meaning of the Social Security Act.[4]  See Caruso v. Comm'r of Soc. Sec., 99 F. App'x 376, 380 n.5 (3d Cir. 2004) ("Although [the court] generally prefers reports from physicians, the ALJ may rely upon the opinions of [a non-acceptable medical source] to ascertain the severity of a claimant's impairments.") (citing Hartranft, 181 F.3d at 361).  However, the ALJ may consider the report of a non-acceptable medical source only "insofar as it is deemed relevant to assessing a claimant's disability."  Rios v. Barnhart, 57 F. App'x 99, 101 n. 2 (3d Cir. 2003) (quoting Hartranft, 181 F.3d at 361).  In considering the opinion of a non-acceptable medical source, the ALJ may accord the opinion

---

[4] As SSR 06-3p explains:

> [The existing] regulations provide specific criteria for evaluating medical opinions from "acceptable medical sources"; however, they do not explicitly address how to consider relevant opinions and other evidence from "other sources" listed in 20 C.F.R. § 404.1513(d) and § 416.913(d).  With the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily by physicians and psychologists.  Opinions from these medical sources . . . are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file.

Social Security Ruling 06-3p, 2006 SSR LEXIS 4, at 9 (Aug. 9, 2006).

little weight.  Id.  Moreover, the ALJ must consider the source's report in the context of the entire administrative record.  Id.

The Court finds that the ALJ did not err in determining that Cunningham is not an acceptable medical source, and according little weight to her assessment of Plaintiff's alleged disability.  First, Cunningham is a registered nurse, not a physician.  Thus, the ALJ was under no statutory obligation to accord great weight to her assessment of Plaintiff's medical condition.  Second, substantial evidence supports the ALJ's determination that Cunningham's assessment is not entitled to great weight because her clinical findings do not support her assessment of the severity of Plaintiff's impairments.  See 20 C.F.R. § 416.927(c)(3) (noting that "the more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight [the ALJ should] give that opinion.").  Cunningham reported that Plaintiff was severely restricted in her ability to "sustain work performance & attendance in a normal work setting."  (Tr. 25, 251, 302).  However, on October 8, 2007, Cunningham gave Plaintiff a GAF score of 65 to 70.  (See Tr. 251).  That score indicates that Plaintiff's symptoms were "mild," and that although Plaintiff had "some difficulty in . . . occupational . . . functioning," she "generally function[s] pretty well," and "has some meaningful interpersonal relationships."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).  On another occasion, Cunningham gave Plaintiff a GAF score of 60.  (Tr. 299).  That score indicates that Plaintiff's symptoms were "moderate," and that she has "moderate difficulty in social, occupational, or school functioning."  Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000).  Neither of the GAF scores Cunningham gave Plaintiff suggests that she was severely restricted in her ability to "sustain work performance & attendance in a normal work setting."  (Tr. 302).  Because the GAF scores Cunningham gave Plaintiff conflict with

Cunningham's assessment of the severity of Plaintiff's impairments, the ALJ did not err by according Cunningham's medical opinion little weight.

The ALJ also examined Cunningham's progress notes during her employment by Phoenix Behavioral System and F.H. Everett & Associates. (Tr. 25). The ALJ concluded that those progress reports demonstrate that changes in Plaintiff's mood and the severity of her impairments depended upon her family problems and her medication, not a listing level impairment. In addition, the ALJ determined that Plaintiff's progress reports "were consistent with moderate limitations in performing her activities of daily living, social functioning and concentration, persistence or pace." (Tr. 25). The administrative record as a whole supports those findings.

The record supports the ALJ's determination that Plaintiff's physical impairments were exacerbated by her familial problems. On January 16, 2008, Cunningham reported that Plaintiff demonstrated stress, anger, and mood fluctuations. (Tr. 284). At that time, Cunningham noted that Plaintiff expected to give birth to a child, and that an undisclosed individual yelled at Plaintiff's sister-in-law. (Id.). On January 20, 2008, Cunningham noted that Plaintiff exhibited a "tired, calm mood." (Id.). On that date, Plaintiff reported that her sister-in-law was very helpful. (Id.). Thereafter, on February 20, 2008, Cunningham reported that Plaintiff had difficulty sleeping and experienced a high level of stress due to a marital conflict. (Tr. 283). On the same date, Plaintiff reported that she was angry because her husband wanted her to undergo a DNA test to prove that he fathered her baby. (Id.). In April 9, 2008, Cunningham again reported that Plaintiff was "angry," "hyper" and "easily frustrated," and that she "rages when upset." (Tr. 279). On that date, Cunningham observed that Plaintiff was experiencing "marital discord" and noted that she "got into it last nite [sic]" with a family member. (Tr. 279).

In May 2008, Plaintiff again demonstrated an anxious mood, pressured speech, and reported marital stress. (Tr. 278). On May 7, 2008, Cunningham reported that Plaintiff was "on edge" because of her "husband's [lack of] affection/love." (Id.). Later, in mid-July 2008, Cunningham reported that Plaintiff's marriage was improving, and she experienced fewer mood swings. (Tr. 275). Finally, in late July 2008, Cunningham noted that Plaintiff was "tired," "easily frustrated," and "depressed." (Tr. 275). At the time, Cunningham observed that Plaintiff's marriage was "better overall," but noted that Plaintiff had an argument with her husband, and complained that her husband did not make his family a priority. (Id.).

The administrative record also supports the ALJ's determination that medication affected Plaintiff's condition. In March 2008, Plaintiff began taking Lamictal to control her symptoms. (Tr. 281). On April 9, 2008, Plaintiff reported that she was "doing better with Lamictal." (Tr. 279). In late April, Cunningham reported that Plaintiff was "doing better on Lamictal," but noted that Plaintiff was "depressed." (Tr. 279).

Overall, those reports support the ALJ's determination that Plaintiff's emotional and psychological condition frequently changed due to her familial problems and her medication. Thus, Plaintiff's argument that the ALJ failed to accord proper weight to Cunningham's reports is unpersuasive.[5]

---

[5] Plaintiff also asserts that the ALJ failed to consider the opinion of Dr. Finkelstein. However, the ALJ's opinion demonstrates that he did consider Dr. Finkelstein's report. The ALJ noted that Plaintiff "was diagnosed as a teenager with borderline personality disorder." (Tr. 18). Because Plaintiff points to no evidence that a doctor other than Dr. Finkelstein diagnosed her with personality disorder during her teenage years, the ALJ's opinion clearly refers to Dr. Finkelstein's report.

Moreover, the fact that the ALJ did not accord great weight to the opinion of Dr. Finkelstein is not reversible error. First, Plaintiff does not argue, and there is no evidence that Dr. Finkelstein's report demonstrates that Plaintiff suffered from symptoms beyond those contained elsewhere in the administrative record. Dr. Finkelstein summarized Plaintiff's disorder as follows:

> [Plaintiff] meets the diagnostic criteria for borderline personality disorder as characterized by the following: patterns of unstable and intense interpersonal relationships; concern about rejection from others; unstable self-image;

## C. The ALJ's Credibility Determination

Plaintiff argues that the ALJ inappropriately gave considerable weight to her daily activities when assessing her credibility. Specifically, Plaintiff contends that her "ability to provide care for children . . . and her ability to perform housework . . . is not a reason to attack her credibility." (Pl.'s Br. at 17). In support of that argument, Plaintiff points to the following quotation in Smith v. Califano, 637 F.2d 968, 971-72 (3d Cir. 1981): "[d]isability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." In response, the Commissioner argues that pursuant to 20 C.F.R. § 416.929(c)(3)(i), the ALJ may consider daily activities when evaluating a claimant's symptoms. The Court agrees with the Commissioner.

The Third Circuit established the following four-part analysis to determine the credibility of a social security claimant's subjective complaints:

> (1) that subjective complaints of pain be seriously considered, even where not fully confirmed by objective medical evidence; (2) that subjective pain may support a claim for disability benefits and may be disabling; (3) that when such complaints are supported by medical evidence, they should be given great weight; and finally (4) that where a claimant's testimony as to pain is reasonably supported by medical evidence, the ALJ may not discount [the] claimant's pain without contrary medical evidence.

Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985) (internal citations and quotation marks omitted). If an ALJ does not find the subjective complaints of an individual credible, however,

---

impulsive behaviors; affective instability and reactivity; intense rages and significant disassociative symptoms.

(Tr. 196). Those symptoms are generally consistent with the other medical reports in the administrative record. Moreover, Dr. Finkelstein's report states that "[s]pecial attention should be given to [Plaintiff's] . . . chaotic family relationships as this dynamic appears to contribute to the propensity for intense emotional reactions and disassociative experiences," and noted that Plaintiff should "be evaluated by a psychiatrist to determine an appropriate medication regimen." (Id.). As previously mentioned in this Opinion, the ALJ considered the fact that Plaintiff's familial problems tend to exacerbate her symptoms, and noted that medication helped reduced the severity of her impairments. Accordingly, the ALJ did not commit reversible error by not giving considerable weight to Dr. Finkelstein's report.

> the determination or decision rationale must contain a thorough
> discussion and analysis of the objective medical and other
> evidence, including the individual's complaints of pain or other
> symptoms and the adjudicator's personal observations.  The
> rationale must include a resolution of any inconsistencies in the
> evidence as a whole and set forth a logical explanation of the
> individual's ability to work.

SSR 95-5p; see Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 433 (3d Cir. 1999).

Here, the Court is satisfied that the ALJ provided "a thorough discussion and analysis" of

Plaintiff's daily activities and found that Plaintiff's complaints of pain were incredible.

Schaudeck, 181 F.3d at 433 (quoting SSR 95-5p).  As a threshold matter, the Court notes that 20

C.F.R. § 416.929(c)(3)(i) expressly provides that an ALJ may consider a claimant's daily

activities to determine the severity of the plaintiff's symptoms.  Thus, Plaintiff's principal

contention that the ALJ erred by considering her daily activities in determining the severity of

her symptoms is meritless.  See Burns v. Barnhart, 312 F.3d 113, 129-30 (3d Cir. 2002) (finding

evidence that plaintiff could "tak[e] care of his four dogs and play[] drums" belied his claim that

he could only lift one pound, and that he could not work an eight-hour workday); Steed v.

Astrue, 524 F.3d 872 (8th Cir. 2008) (finding plaintiff's claimed physical limitations incredible

due to evidence in record that plaintiff could "perform housework, take care of her child, cook,

and drive."); Diggs v. Atrue, No. 10-2537, 2011 WL 2447509, at *15 (D.N.J. June 14, 2011)

(determining that plaintiff's subjective complaints of pain were incredible based, in part, on

evidence that plaintiff could perform basic chores such as "doing laundry, washing dishes,

ironing, and mowing the lawn.").

In reaching his determination that Plaintiff's depression and bi-polar disorder are not

disabling conditions, the ALJ conducted a detailed examination of Plaintiff's daily activities.

First, the ALJ noted that Plaintiff could "care for her 3 children, ages 5, 3 and 18 months;

perform house work, including vacuuming, mopping and washing the bathrooms and do some cooking." (Tr. 24). Second, the ALJ highlighted the fact that Plaintiff regularly fed her children, changed their clothes, and took them to the park or a pond when the weather was hot. (Id.). Finally, the ALJ emphasized the fact that Plaintiff's GAF scores indicated that her symptoms were mild or moderate. (Tr. 25). Based upon those findings, the ALJ determined that Plaintiff's claim that she needs help with daily living activities in her Adult Function Report, was incredible. (Tr. 24). The ALJ also found no reason why Plaintiff could not perform simple routine tasks in an employment setting if she could perform simple, routine tasks in her household and take care of her three children. (Tr. 24-25).

Plaintiff's reliance upon Smith is misplaced. In Smith, the plaintiff applied for disability benefits due to a chronic ulcer condition. 637 F.2d at 970. One of the plaintiff's treating physicians confirmed that the plaintiff suffered from chronic colon and ulcer conditions. Id. at 971. The ALJ determined that the plaintiff did not suffer from a disabling condition based in part, on his determination that the plaintiff "had full use of his hands, arms and legs," and evidence that the plaintiff did shopping and "went hunting twice." Id. at 971 (internal quotations omitted). The Third Circuit reversed the ALJ's decision denying the plaintiff disability benefits. Critically, the Third Circuit found that the ALJ erred in finding that the "sporadic" and "transitory" activities the plaintiff performed, such as shopping and hunting on two occasions, undermined the medical evidence supporting the plaintiff's claimed disability. Id. at 972 (noting that "shopping for the necessities of life is not a negation of disability and even two sporadic occurrences such as hunting might indicate that the claimant was partially functional on two days.").

Unlike the plaintiff in <u>Smith</u>, who shopped for "necessities" and went hunting on two occasions, here, Plaintiff performs a variety of tasks to support her children on a systematic, continuous basis. The administrative record reveals that Plaintiff provides primary support for her three children and regularly performs a variety of tasks that require significant physical exertion such as vacuuming, mopping, washing bathrooms, cooking, and washing clothes. (Tr. 351, 361). Plaintiff also takes her children to the ballpark and, on occasion, to a pond. (Tr. 361). Because Plaintiff's level of daily activity differs dramatically from the plaintiff in <u>Smith</u>, Plaintiff's reliance on <u>Smith</u> is misplaced.

Therefore, in light of the evidence in the administrative record, the Court finds that substantial evidence supports the ALJ's determination that Plaintiff's testimony was incredible.

### D. The Vocational Expert's Testimony

Plaintiff also argues that the ALJ's RFC finding is erroneous, and asserts that the VE's testimony is not entitled to great weight because the ALJ did not include all of Plaintiff's established limitations in the hypothetical question he posed to the VE. Specifically, Plaintiff argues that the ALJ improperly characterized her mood swings as "infrequent," and asserts that her "mood swings are not infrequent, but occur any time she is at all stressed, which happens frequently." (Pl.'s Br., at 20). The Commissioner argues that the hypothetical question the ALJ posed to the VE accurately reflects the impairments supported by the record. The Court agrees.

In determining the severity of a claimant's alleged disability, the ALJ may rely on the response of a vocational expert to a hypothetical question posed by the ALJ. As the Third Circuit explained in <u>Podedworny v. Harris</u>, 745 F.2d 210, 218 (3d Cir. 1984),

> Testimony of vocational experts in disability determination proceedings typically includes, and often centers upon, one or more hypothetical questions posed by the ALJ to the vocational expert. The ALJ will normally ask the expert whether, given

certain assumptions about the claimant's physical capability, the claimant can perform certain types of jobs, and the extent to which such jobs exist in the national economy.

However, "a hypothetical question must reflect all of a claimant's impairments that are supported by the record." Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987). If the hypothetical question does not reflect all of the claimant's impairments, "the question is deficient and the expert's answer to it cannot be considered substantial evidence." Id. (citing Podedworny, 745 F.2d 210; Wallace v. Secretary, 722 F.2d 1150 (3d Cir. 1983).

In this case, the ALJ asked the VE whether an individual with the following characteristics could perform a job in the national economy. The ALJ described an individual "suffering from depression . . . with a bipolar component" and a "personality disorder," who suffers "infrequent mood swings somewhat relieved by medications," without side effects. (Tr. 373). The ALJ also noted that the individual suffers from constipation. (Tr. 373). In addition, the ALJ noted that the individual is "moderately limited in her ability to perform ADLs, and to interact socially[,] and . . . maintain her concentration, persistence, and pace." (Tr. 374). Finally, the ALJ described an individual who could (1) lift ten pounds frequently, (2) twenty pounds occasionally, (3) stand for four hours, and (4) sit for four hours consistently during an eight-hour workday for five days each week, and who can perform sedentary light work activities. (Id.). The ALJ further noted that the individual "needs to have a simple routine, unskilled job" that involves "low stress, low concentration, [and] low memory," and a job that requires little interaction with co-workers or supervisors. (Tr. 373-74).

The ALJ's description accurately reflects Plaintiff's impairments, and is supported by substantial evidence in the administrative record. First, the administrative record is replete with evidence that Plaintiff suffers from moderate depression and bipolar disorder. (Tr. 207, 215,

247) (bipolar disorder); (Tr. 259, 283) (depression). Second, there is substantial evidence in the record that Plaintiff suffered "infrequent mood swings." (Tr. 373). The administrative record reveals that Plaintiff's mood fluctuated from "tired" and "calm" to "angry," "agitated," and "frustrated." For example, on October 13, 2004, Plaintiff's examiner reported no depression, mood swings, or anxiety. (Tr. 204). In addition, in February 2005, Plaintiff reported that she experienced "no mood swings" and noted that she was "working" and "getting along well." (Tr. 201). Furthermore, in January 2003, Plaintiff's examiner noted that Plaintiff displayed a "tired, calm mood." (Tr. 284). On November 6, 2007, a medical examiner noted that Plaintiff had a "smooth week" and noted that she was "doing ok." (Tr. 245). Finally, a report from August 27, 2008 indicated that Plaintiff's appearance was neat, and she was cooperative, friendly, spontaneous, and coherent. (Tr. 297).

However, on a number of occasions, a medical examiner reported that Plaintiff was "agitated," and "irritable." For example, on October 29, 2007, Plaintiff's progress report noted that she was in an "irritable mood." (Tr. 246). On October 8, 2007, Plaintiff's progress report noted that she was "on edge," "suspicious," and "very emotional." (Tr. 252). In addition, on August 30, 2007, Plaintiff's progress report noted that she was "agitated." (Tr. 253). On the whole, those findings support the ALJ's determination that Plaintiff's mood swings were not an everyday occurrence; rather, they occurred at different intervals based, at least in part, on the severity of her family problems.

Plaintiff's argument that the ALJ improperly characterized her mood swings as "infrequent" is meritless. Although the ALJ may have slightly exaggerated the rarity of Plaintiff's mood swings by using the term "infrequent," the record generally supports the ALJ's determination that Plaintiff's mood swings were sporadic, and generally occurred when Plaintiff

experienced familial problems. Moreover, the administrative record reveals that Plaintiff's mood swings do not prevent her from engaging in a variety of activities on a <u>daily</u> basis such as cleaning, washing clothes, mopping, vacuuming, picking items up around her house, talking on the phone, fixing her bed or performing other tasks such as cleaning the bathrooms. (Tr. 361). The fact that Plaintiff could perform a variety of tasks on a <u>daily</u> basis, and reported no mood swings during some of her medical evaluations, supports the ALJ's characterization of Plaintiff's mood swings as "infrequent."

Plaintiff's argument that the ALJ's description of Plaintiff's physical limitations is inconsistent with the ALJ's RFC assessment is also unpersuasive. Curiously, Plaintiff's counsel argues "[t]he question to the VE finds Claimant to have moderate depression with infrequent mood swings . . . while the RFC does not mention mood swings at all." (Pl.'s Br. at 19). If, as Plaintiff argues, the ALJ did not consider Plaintiff's mood swings in determining her RFC, but included her mood swings in the hypothetical question to the VE, then the VE's response suggests that Plaintiff was capable of working with even <u>greater</u> physical limitations. Thus, Plaintiff's argument that the ALJ did not consider Plaintiff's mood swings in determining her RFC is unavailing.

Ultimately, the ALJ's description of Plaintiff's impairments is supported by the administrative record. Because the ALJ's decision is supported by the administrative record, Plaintiff's challenge to the VE's testimony fails.

## IV.     CONCLUSION

For the reasons discussed above, the Court finds that the ALJ had substantial evidence to determine that Plaintiff was not disabled within the meaning of the Social Security Act.

Accordingly, the Commissioner's motion for summary judgment is **GRANTED**, and Plaintiff's motion for summary judgment is **DENIED**.  An appropriate order shall enter today.


Dated:  8/19/2011                              /s/ Robert B. Kugler
                                               ROBERT B. KUGLER
                                               United States District Judge